[—— NYS2d ——]

In the Matter of NORTH SHORE UNIVERSITY HOSPITAL CENTER FOR EXTENDED CARE AND REHABILITATION, Appellant, v COMMISSIONER OF THE NEW YORK STATE DEPARTMENT OF HEALTH et al., Respondents.

Third Department, July 1, 1993

**APPEARANCES OF COUNSEL**

*Cadwalader, Wickersham & Taft,* New York City *(Jeffrey Q. Smith, Peter G. Bergmann* and *William J. Natbony* of counsel), for appellant.

*Robert Abrams, Attorney-General,* Albany *(Patrick Barnett-Mulligan* and *Peter H. Schiff* of counsel), for respondents.

## OPINION OF THE COURT

YESAWICH JR., J.

Petitioner, a 250-bed nursing home located on the same Nassau County campus as its sponsor, North Shore University Hospital, began operations in April 1989. In establishing petitioner's initial Medicaid reimbursement rate, respondents employed the methodology set out in 10 NYCRR former 86-2.15,[1] whereby the direct cost component of the rate for a new facility is determined using the State-wide base direct case mix neutral (hereinafter CMN) cost per day, and the indirect cost component is based on the peer group base indirect price per day. Respondents designated petitioner a freestanding facility for purposes of peer grouping.[2] Petitioner appealed the resulting rate determination, asserting that 10 NYCRR former 86-2.15 is irrational on its face and as applied, and also that petitioner's facility was improperly designated as freestanding rather than hospital-based. Respondent Commissioner of

1. To the extent relevant here, 10 NYCRR former 86-2.15 provided as follows:

"(a) (1) This subdivision shall apply * * * when there is a new facility without adequate cost experience * * *.

"(b) The rates certified for such residential health care facilities * * * shall be determined in accordance with the following:

"(1) For the first three months of operation, the direct component of the rate shall be equivalent to the statewide base direct case mix neutral cost per day after application of the RDIPAF as determined pursuant to section 86-2.10 of this Subpart. The facility shall perform an assessment of all patients, pursuant to section 86-2.30 of this Subpart, at the beginning of the fourth month of operation and at the beginning of each third month thereafter until the end of the six-month period referred to in section 86-2.2 (e) of this Subpart. The direct component of the rate shall be adjusted pursuant to section 86-2.10 of this Subpart, effective the first day of the month of each assessment period, based on the facility's case mix.

"(2) The indirect component of the rate shall be equivalent to the peer group base indirect price per day after application of the RDIPAF as determined pursuant to section 86-2.10 of this Subpart until the first day of the six-month period referred to in section 86-2.2 (e) of this Subpart."

2. Medicaid reimbursement rates are comprised of four components, derived from measures of the facilities's direct, indirect, noncomparable and capital costs. Under the "RUG-II" reimbursement system, adopted in 1986, the calculation of direct costs, which had previously required categorization of each facility as "high intensity" or "low intensity", no longer involves such a classification; in its place, an assertedly more accurate method which incorporates a specific assessment of the level of care required by each patient is used. The indirect cost component is derived from average costs among similarly situated facilities, referred to as a "peer group"; one of the criteria used to place a facility in a given peer group is its designation as "freestanding" or "hospital-based".

Health denied the relief sought and petitioner commenced this CPLR article 78 proceeding to review that determination. Supreme Court found that, because petitioner did not prove that its initial reimbursement rate failed to adequately reimburse it as required by Public Health Law § 2807 (3), petitioner had not met its burden of proof and dismissed the petition. This appeal followed.

■ It is petitioner's contention that the rate-setting regulation is irrational, arbitrary and capricious on its face, in that it uses base CMN costs per day, rather than mean CMN costs, and therefore allegedly reimburses new facilities "as if they are the most efficient in the state". The base CMN costs do not, however, represent the lowest costs reported by any facility; they are derived from the average costs of all facilities in the State, with a small downward adjustment (see, 10 NYCRR 86-2.10 [c] [3] [iii]). To succeed on this aspect of the litigation, petitioner must make a " 'compelling showing' " that the methodology applied to calculate a temporary rate for a new facility is unfair or arbitrary on its face (Matter of Society of N. Y. Hosp. v Axelrod, 70 NY2d 467, 473; Matter of Catholic Med. Ctr. v Department of Health, 48 NY2d 967, 968); this petitioner has simply failed to do. Respondents, on the other hand, convincingly argue that inasmuch as excess amounts paid to a facility during its start-up period cannot be recouped (see, Matter of Wellsville Manor Nursing Home v Axelrod, 142 AD2d 225, 228, lv denied 74 NY2d 602), it is not unreasonable to set initial rates at the low end of the range of acceptable values. The use of base values for this transition period is thus not facially arbitrary (see, Matter of Highland Nursing Home v Axelrod, 164 AD2d 83, 85).

■ Turning to the issue of whether the regulation is irrational as applied to petitioner, we find that petitioner has not met its burden of demonstrating that the actual amount it received did not provide adequate reimbursement for those costs which an "efficiently and economically operated facilit[y]" would incur (Public Health Law § 2807 [3]; see, 42 USC § 1396a [a] [13] [A]). The mere fact that the reimbursement rate calculated for the first six-month period during which petitioner had 90% occupancy[3] was 42% higher than the rate paid pursuant to this initial formula, without more, is not

---

3. Beginning with this period, a facility's reimbursement is calculated with reference to its own costs, subject to base and ceiling limits, rather than by using State-wide average figures.

sufficient to meet that burden. Until a newly established facility reaches a certain level of occupancy, it cannot be run in an economically efficient manner; as a consequence, it is not irrational to reimburse such a facility at a rate based on costs incurred by comparable facilities that are up and running. Furthermore, the Department of Health's Director of the Bureau of Residential Health Care Facility Reimbursement avers that "[p]etitioner will receive substantial upward rate adjustments based on its six-month cost report". Finally, petitioner has presented not a shred of evidence that the challenged regulation runs counter to the Federal mandate that a State's Medicaid reimbursement program must "assure that payments * * * are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population" (42 USC § 1396a [a] [30] [A]).

Meritless also are petitioner's equal protection claims. Although it appears that respondents calculated the rate of at least one similar facility, the Rosalin and Joseph Gurwin Jewish Geriatric Center (hereinafter Gurwin), by reference to the ceiling CMN costs rather than the base costs, there is evidence in the record that Gurwin received this treatment because it agreed to priority admission of "alternate level of care" patients, who consume more resources than the average patient. No such promise was made by petitioner; thus, the disparity in treatment was not without a rational basis.

■ Nor are we persuaded that respondents improperly designated petitioner a freestanding, rather than a hospital-based, facility. Because nursing homes that are closely intertwined with acute-care facilities (hospitals) generally pay an allocated portion of the higher overhead costs of the hospital, such facilities are placed within separate peer groups, which customarily results in a higher rate of reimbursement for indirect costs than that paid to freestanding facilities. Petitioner maintains that its physical location on the same campus as North Shore University Hospital, and the symbiotic relationship it has with the hospital—it depends on the hospital for many of its essential services, administrative and executive support—require that it be considered a hospital-based facility for Medicaid reimbursement purposes.

Undisputed though it is that during the process of applying for approval petitioner accepted respondents' condition that the new facility be classified as freestanding, petitioner nevertheless argues that it did so only because (1) at that time, a

"high intensity" freestanding facility was reimbursed at rates approximating those of a hospital-based operation, and (2) it was assured that such designation would not prevent it from "breaking even" in its first year of operation. After petitioner received approval, however, the reimbursement methodology changed; among other things, the difference between "high intensity" and "low intensity" freestanding facilities was eliminated. As a result, petitioner maintains that its reimbursement rate as a freestanding facility was less than it would have been had the previous methodology been employed. Significantly though, the change effected by the new methodology did not result in a reimbursement rate below that at which petitioner's accountant agreed operation would be feasible. Furthermore, although petitioner sought to amend its application in February 1987, with full knowledge of the new reimbursement system and its elimination of the "high/low intensity" dichotomy, no effort was made at that time to alter its freestanding designation. Under these circumstances, we find no reason to relieve petitioner from the result of its voluntary waiver of its right to seek "hospital-based" status. The case of *Matter of Good Samaritan Hosp. v Axelrod* (150 AD2d 775, *lv denied* 75 NY2d 703), relied upon by petitioner, does not require a different result, for it was not a change of law which occasioned petitioner's classification as freestanding, but petitioner's voluntary waiver of its right to seek a different status.

Moreover, even were we to disregard petitioner's legitimate waiver, respondents' decision not to accord it hospital-based status is amply supported by the record; there is no evidence that respondents palpably disregarded any of the five criteria for determining whether a facility should be considered "hospital-based" *(see,* 10 NYCRR 86-2.10 [a] [13] [ii]; *compare, Matter of Bassett Hosp. v Axelrod,* 156 AD2d 826, 828). To the contrary, both of petitioner's approvals were granted on the basis that it would be designated freestanding; it is not architecturally conjoined with a hospital; it calculates its costs separately from those of the hospital and is not allocated any part of the hospital's overhead or other costs; and there appears, from the cost projections submitted with its applica-

tion for approval, to be no need for "hospital-based" status to assure economic or efficient operation.

We have considered petitioner's other arguments and find them lacking in substance.

MIKOLL, J. P., MERCURE, CREW III and HARVEY, JJ., concur.

Ordered that the judgment is affirmed, without costs.